UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 7:19-CR-7-REW-EBA |
| v. ) | |
| ) | OPINION AND ORDER |
| SCOTTY R. AKERS, M.D., et al., ) | |
| ) | |
| Defendants. ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The Court confronts Defendant Akers's and the Government's pending motions *in limine*.[1] DE ##34, 42 & 43. The Indictment alleges that Defendants Scotty R. Akers, M.D. and Serissa L. Stamper[2] conspired to unlawfully distribute controlled substances outside the scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

---

[1] As a general matter, the Court is reluctant to rule in advance unless resolution is clear on the current record. *See, e.g.*, *Bouchard v. Am. Home Products Corp.*, 213 F. Supp. 2d 802, 810 (N.D. Ohio 2002) ("The court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds.") (citing *Luce v. United States*, 105 S. Ct. 460, 463 (1984)); *Luce*, 105 S. Ct. at 463 ("A reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context."); *Gresh v. Waste Servs. of Am., Inc.*, 738 F. Supp. 2d 702, 706 (E.D. Ky. 2010) (generally remarking that "rulings [on evidentiary matters] should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context"); *United Propane Gas, Inc. v. Pincelli & Assocs., Inc.*, No. 5:13-CV-190-TBR, 2018 WL 6533341, at \*1 (W.D. Ky. Dec. 12, 2018) ("Motions in limine provided in advance of trial are appropriate if they eliminate evidence that has *no legitimate use at trial for any purpose*.") (emphasis added). The Court will monitor the evidence at trial and issue its rulings in accordance with the law, mindful of the Defendants' constitutional rights to a complete defense. *See United States v. Smead*, 317 F. App'x 457, 462 (6th Cir. 2008) ("The United States Constitution guarantees criminal defendants 'a meaningful opportunity' to present a complete defense.") (citations omitted).

[2] Though the docket identifies Stamper primarily as Serissa Collier, the briefing generally refers to her as Serissa Stamper. *See* DE #47 (Stamper's Response to DE #42). The Court here takes the parties' lead.

DE #1 at 2–3 (Count 1). The United States also charges Defendants with aiding and abetting one another in the unlawful distribution of six identified prescriptions, in violation of § 841(a)(1) and 18 U.S.C. § 2. *Id.* at 3 (Counts 2–7). Jury selection is set to begin on October 18, 2019, with presentation of evidence beginning October 21. *See* DE #45 (Minutes).

1. **Akers's Motion *in Limine*[3]**

Akers seeks to exclude two categories of evidence on Rule 401/403 bases: (1) proof relating to the Kentucky Board of Medical Licensure (KBML) investigation of Akers, and, specifically, an Agreed Order into which Akers and the KBML entered; and (2) proof generally "about the effects of prescription drug abuse on the community." DE #34. The United States opposes exclusion of either evidentiary class. DE #40.

## KBML Proof

The KBML investigated Akers between November 2017 and May 2018, prompted by a third-party worker's compensation administrator's submitted grievance. Akers and the KBML ultimately entered an Agreed Order containing several factual and legal stipulations regarding his controlled substance prescribing conduct, patient management and oversight procedures, and record-keeping practices. *See* DE #40-1 (Agreed Order). Akers consented to an indefinite practice restriction, and the Agreed Order conditioned any future license reinstatement effort on strict compliance with several listed corrective conditions. *See id.* at 8–11.

Akers contends that the "[e]vidence relating to claims asserted by the [KBML] [is] not relevant to any issue at trial[.]" DE #34 at 3. Evidence is relevant if it tends to make any fact of consequence to the action's determination more or less probable than it otherwise would be. *See*

---

[3] Although DE #34's caption includes Stamper, the motion substantively pertains to only Akers. Stamper has not responded to DE #34.

Fed. R. Evid. 401. "The standard for relevancy is 'extremely liberal.'" *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006) (quoting *Douglass v. Eaton Corp.*, 956 F.2d 1339, 1344 (6th Cir. 1992)); *see id.* at 738–39 ("[E]ven if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has the slightest probative worth.") (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 475 (6th Cir. 1996) (citation omitted)). Relevant evidence is generally admissible. Fed. R. Evid. 402.

The KBML Agreed Order[4] easily clears the Rule 401 hurdle. The relevance of this stipulation—containing Akers's own admissions, which, if offered against him, are non-hearsay statements per Rule 801(d)(2)(A)[5]—is readily apparent. The Government seeks to prove that Akers conspired to distribute opioids outside the scope of his professional practice and not for any legitimate medical purpose, during the August 2016 to May 2018 timeframe, and under certain specific common circumstances (*i.e.*, in non-medical settings, without meaningful patient examinations, and generally for cash exchanges). *See* DE #1 (Indictment). Akers's own stipulations regarding his prescribing practices and patient interactions during that temporal

---

[4] The Government notes that the scope of KBML investigation proof it will seek to introduce is limited to Akers's own statements (primarily in the Agreed Order) and the patient records he submitted to the Board. *See* DE #40 at 6 n.3. The United States further states that the KBML investigation identified seven specific patients whose prescriptions are involved in this case. *Id.* at 7. The Court, however, does not have before it any of the referenced patient record proof; nor does the Agreed Order identify by name any specific patients. The Court's ruling here thus extends only to the Agreed Order itself, which the Government attaches to its DE #40 response. Although a similar analysis likely will apply to the underlying patient records, the Court declines to prospectively determine admissibility of evidence not yet presented for its review.

[5] Stamper has neither responded to nor joined in the exclusion request; the Court would, as appropriate, restrict the jury's consideration of the Agreed Order evidence against her at trial via proper instruction. *See, e.g.*, *United States v. Caroni*, No. 3:10-CR-101-MCR, 2011 WL 5184194, at *1 (N.D. Fla. Nov. 1, 2011) (reaffirming the admissibility of a medical board Consent Order against the entering doctor under Rule 801(d)(2)(A) and noting that "admission of the Consent Order would not result in unfair prejudice to [that doctor's co-defendant] because he could be protected by a limiting instruction").

3

window—and specifically with respect to several of the Government-identified patients and under the alleged conspiracy circumstances—are unquestionably germane to facts at issue in this case.[6] *See, e.g.*, DE #40-1 (Agreed Order) at 2 (Akers admitting that he continued to write prescriptions on a pad from his closed pain clinic); *id.* at 3–4 (admitting specific prescribing conduct—including identified patients, dates, drug types, and dosages—from December 2017 through March of 2018); *id.* at 5 (providing data regarding Akers's overall prescribing record during the October 2016 to February 2018 timeframe).

Akers's Agreed Order admissions are exceptionally probative of his course of prescribing conduct and patient oversight/management during the relevant period and, consequently, centrally relevant to whether Akers's conduct was within usual professional scope and for legitimate medical purposes. The Agreed Order's stipulated facts further illuminate Akers's record-keeping practices during the at-issue timeframe and are similarly probative of practice legitimacy. *See id.* at 5–6. Further, Akers's entrance into the Agreed Order and adoption of its content—including consulting doctors' characterizations of his practice and prescribing habits, and Akers's own concession of statutory/regulatory violations—is probative of his knowledge and intent and, thus, directly relevant to the criminal charges in this case. *See, e.g.*, *id.* at 3 (acknowledging consulting physician's findings that Akers's prescribing "pattern clearly was against the standards of practice, promoting opioid abuse that could lead to opioid overdose/diversion and death[]"); *id.* at 7 (admitting that he "engaged in conduct which violates the provisions of KRS 311.595(9)," which itself prohibits "dishonorable, unethical, or unprofessional conduct of a character likely to deceive,

---

[6] The KBML investigation period (spanning from November 1, 2017 to May 23, 2018, and further encompassing analysis of prescribing data from the October 1, 2016 to February 25, 2018 period, per the Agreed Order, *see* DE #40-1 at 2, 4, 11) significantly overlaps with the Indictment-alleged August 2016 to May 2018 timeframe, *see* DE #1 at 2.

4

defraud, or harm the public[]").[7] Indeed, the stipulated admissions—relating to Akers's opioid prescribing and practice deficiencies during the Indictment-alleged timeline—are just the sort of facts the Government will seek to prove at trial. In sum, the KBML Agreed Order easily satisfies minimal Rule 401 relevance requirements.

Nor does Rule 403—the "last harbor available" in Akers's exclusionary venture—carry the day. *See Griffin v. Condon*, 744 F. App'x 925, 931 (6th Cir. 2018). Akers argues that "even if the KBML's claims did have some minimal relevance, the probative value would clearly be outweighed by the potential for unfair prejudice, confusing, and misleading the jury." DE #34 at 4–5. He speculates that, due to the proceedings' differing legal standards and proof burdens, any KBML proof is likely "to distract from the true questions at issue and suggest a decision on an improper basis." *Id.* at 4. The Court disagrees. Pertinent here, Rule 403 permits the Court to exclude relevant proof only "if its probative value is *substantially* outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury[.]" Fed. R. Evid. 403 (emphasis

---

[7] The admitted statutory violations—including violating (or conspiring to violate) "any provision or term of any medical practice act, including but not limited to the code of conduct promulgated by the board[,]" *see* § 311.595(12)—surely make it more probable that Akers engaged in conduct equal to the crimes charged in the Indictment. *See* 201 KAR 9:260 (outlining the § 311.595-mandated code of physician conduct); *id.* at § 10 (noting that "[a]ny violation of the professional standards established in this administrative regulation shall constitute a violation of KRS 311.595(12) and (9)"); *id.* at § 2 ("Each physician prescribing or dispensing a controlled substance shall obtain and document all relevant information in a patient's medical record . . . in sufficient detail to enable the board to determine whether the physician is conforming to professional standards for prescribing or dispensing controlled substances[.]"); *id.* at § 3 (requiring a prescribing physician to evaluate each patient's medical history, examine benefits and risks to the patient, and "make a deliberate decision that it is medically appropriate to prescribe or dispense the controlled substance in the amount specified"); *id.* at § 4 (listing information the physician must document in the medical file of a patient receiving controlled substance for long-term pain treatment); *id.* at § 5 (mandating "that the patient is seen at least once a month initially for evaluation and review of progress" unless specific exceptions apply); *id.* at § 9 (requiring, in the event controlled-substance prescribing extends beyond three months, the physician to regularly query KASPER records (and review that data before issuing any refill) and "keep accurate, readily accessible, and complete medical records" on the subject patient).

5

added). The Rule thus sets a "high bar for exclusion." *United States v. Guzman*, 571 F. App'x 356, 361 (6th Cir. 2014) (citation omitted). Logically, where the probative value of the evidence is especially great, as here, the party challenging its admission must demonstrate correspondingly heightened risk of unfair prejudice to substantially outweigh that value.

Akers is free to highlight at trial—through cross examination and argument—the lighter, civil standard applicable in the KBML proceeding. And, he may advocate for (and the Court envisions) an appropriate limiting instruction, as necessary. *See United States v. Asher*, 910 F.3d 854, 862 (6th Cir. 2018) ("[W]hen determining whether evidence is unduly prejudicial, we consider whether a limiting instruction can mitigate the risk of prejudice.") (citing *United States v. Ayoub*, 498 F.3d 532, 548 (6th Cir. 2007)). The available mitigating measures thus fairly guard against risk of possible jury confusion or misinterpretation of the Agreed Order's . *See, e.g.*, *United States v. Sun*, 673 F. App'x 729, 732 (9th Cir. 2016) (finding no Rule 403 error, among other things, in admission of medical board records, particularly where a limiting jury instruction was given); *United States v. Phung*, No. CR-08-131-M, 2009 WL 10672221, at *1 (W.D. Okla. Jan. 22, 2009) (noting admissibility of medical board evidence and directing the parties to propose "a limiting instruction concerning the burden of proof utilized in the" board proceeding as related to the criminal action).[8]

---

[8] This Court, too, recently found medical board evidence—in particular, an agreed order adopted by the defendant physicians—admissible, ruling that the claimed prejudice risk did not outweigh the evidence's significant probative force and noting that any potential prejudice could be sufficiently reduced by proper instruction and cross. *United States v. Gowder*, No. 6:17-CR-25-REW-HAI, 2018 WL 6932119, at *2 (E.D. Ky. Nov. 14, 2018); *see id.*, DE #400 at 34 (jury instruction regarding state medical board administrative action); *id.*, DE #400 at 35 (jury instruction distinguishing civil malpractice/negligence standard from criminal proof burden).

Notably, the Agreed Order is not merely a bare admission of civil negligence or malpractice; nor is it an independent administrative finding in which Akers played no role. Rather, it is an Akers-adopted, fact-based characterization of Defendant's prescribing conduct and practice management during the at-issue period, thus acutely probative of the Government's case theory for the reasons discussed. The jury may consider Akers's (relevant and highly probative) admissions, contained in the Agreed Order, in this context. Critically, "damage to a defendant's case that results from the legitimate probative force of the evidence[]" does not support Rule 403 exclusion; *unfair* prejudice, under the Rule, refers only to "evidence which tends to suggest a decision on an improper basis." *See United States v. Johnson*, 581 F.3d 320, 327 (6th Cir. 2009). On balance, the potential for unfair prejudice—adequately addressable by the prophylactic measures discussed—simply does not substantially outweigh the evidentiary value of the Agreed Order. Rule 403 exclusion is here unwarranted. *See United States v. LaVictor*, 848 F.3d 428, 444 (6th Cir.), *cert. denied*, 137 S. Ct. 2231 (2017) (noting that "[u]nder Rule 403 . . . , a district court has very broad discretion in" balancing probative value against potential prejudice) (internal quotation marks and citations omitted).

**Evidence Regarding Community Impact of Prescription Drug Abuse**

Akers perfunctorily requests categorical exclusion of "any evidence introduced by the government or arguments about the effect of prescription drug abuse on individuals or the community[,]" contending that such "'scourge of the community' arguments" are more prejudicial than probative. DE #34 at 5. The United States opposes exclusion and identifies, generally, a few types of evidence related to prescription drug abuse that may be relevant and admissible in this case. DE #40 at 11–12. The Court agrees that, for example, testimony regarding addiction risks associated with certain controlled substances, or common marks of drug-seeking behavior, may

7

potentially be probative of the Government's theory that Akers ignored obvious red flags and/or failed to manage his prescribing practice per accepted professional standards. Wholesale exclusion of evidence relating to prescription drug abuse effects is thus inappropriate.

Nevertheless, without specific testimony or other evidence before it, the Court cannot make particularized determinations as to ultimate admissibility. The Court will, in context at trial, weigh the probative value of any evidence the Government seeks to admit against the proof's potential prejudice (if any), per the Rules and applicable standards.[9] Accordingly, the Court denies Akers's request to categorically exclude the challenged evidence, without prejudice to renewal as related to specific proof at trial.

2. **The Government's Omnibus Motion in Limine**

The United States seeks to exclude twelve general categories of evidence, largely based on the Federal Rules of Evidence and other foundational evidentiary principles. DE #42. Akers did not specifically oppose any of the DE #42 exclusion requests.[10] Stamper opposed only two. DE #47. In large part, DE #42 simply asks the Court to fairly and accurately apply the Rules and

---

[9] Of course, arguments or evidence intended specifically to inflame the jury or produce an emotional response would be improper and/or inadmissible. *See, e.g.*, *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991) (barring arguments "calculated to incite the passions and prejudices of the jurors"); *id.* at 1153 (concluding that "government prosecutors are not at liberty to urge jurors to convict defendants as blows to the drug problem faced by society or specifically, within their communities" as "[s]uch appeals are extremely prejudicial and harmful"); *id.* at 1157 (finding that the challenged "statements were deliberately injected into the proceedings to inflame the jurors' emotions and fears associated with the current drug epidemic that is reported daily in our newspapers and which threatens the very fabric of our society"). It is, though, "acceptable for a prosecutor to remind the jury that there is a general community or societal need to convict guilty people." *Reed v. United States*, 133 F. App'x 204, 209 (6th Cir. 2005) (internal quotation marks and citation omitted). The Court expects compliance with this boundary and will hear objections at trial as raised.

[10] Though Akers responded to the United States's companion motion *in limine* addressing specific testimony (DE #43), he did not explicitly reference the DE #42 topics, though he did address Rule 404 issues as related to the challenged testimony. *See* DE #46 (Akers Response). Given DE #46's testimonial focus, the Court evaluates Akers's responsive arguments in the DE #43-related context.

established Circuit law. *See, e.g.*, DE #42 at 1–2 (seeking to exclude speculation regarding the absence of witness testimony); 6th Cir. Pattern Jury Instr. 1.04(4) (directing jurors not to "speculate about what a witness might have said or what an exhibit might have shown[,]" as those things are not evidence); *accord United States v. Burroughs*, 465 F. App'x 530, 535 (6th Cir. 2012) (favorably noting the district court's instruction that the jury "not . . . speculate about what a witness might have said or what an exhibit might have shown"); DE #42 at 3 (seeking exclusion of references to whether others should be charged for the at-issue conduct); 6th Cir. Pattern Jury Instr. 8.08 ("[W]hether anyone else should be prosecuted and convicted for this crime is not a proper matter for you to consider . . . Do not let the possible guilt of others influence your decision in any way.). To this extent, the Court agrees and grants the Government's unopposed requests. Counsel should seek leave before treading into a proscribed area.

Stamper does, however, partially challenge DE #42 in two respects. First, she opposes the United States's effort to exclude any Defendant hearsay statement.[11] DE #42 at 2 (¶ 2). Though Rule 801(d)(2) provides that an opponent's statement is not hearsay, the Rule does not exempt a Defendant's own out-of-court statement (if offered for its truth) from the hearsay bar. *See also* Fed. R. Evid. 802 (barring hearsay generally unless otherwise permitted by the Rules, etc.). Still, as Stamper notes and the Government agrees, hearsay statements may be admissible, in some contexts, if offered for a purpose other than to establish the truth of the asserted matter. Stamper also argues various exceptions under Rule 803. The parties thus debate the relative likelihood of admissibility under multiple Rule provisions, as generally related to categories of potentially introduced statements. *Compare* DE #47 at 2–4 *with* DE #49 at 2–3.

---

[11] The United States clarifies in its reply that it does not oppose Defendant introduction of self-made statements necessary to give context to other admissible statements (*e.g.*, in the course of a conversation). DE #49 at 2. The Court can chart this line at trial.

As the Government recognizes, without context or specific testimony/statements before it, the Court has insufficient information to conclusively resolve the raised hearsay questions. *See* DE #49 at 3 ("Ultimately, the United States understands that the Court will have to rule on some of these matters at trial with the opportunity to review this potential evidence in context."). Thus, the Court grants in part the DE #42 ¶ 2 exclusion request, to the extent it simply seeks adhesion to the hearsay Rules, but defers ruling on any non-hearsay theories or specific exceptions (such as those Stamper suggests in DE #47, *inter alia*) and ultimate proof admissibility until trial, where the Court can evaluate particular statements within the holistic evidentiary scheme.

Second, Stamper (briefly) opposes the United States's sought exclusion of prior good acts evidence. *See* DE #47 at 5; DE #42 at 6–8 (¶ 10). Stamper admits that proof of previous good acts would generally be inadmissible but asserts that "Defendants maintain the right to rebut the accusations against them with respect to the patients listed in the indictment by offering proof of legitimate medical practices for those patients." DE #47 at 5. "Rule 404(b) precludes the use of prior acts evidence to prove a person's character, but it allows such evidence for other purposes, such as proving intent." *United States v. Dimora*, 750 F.3d 619, 630 (6th Cir. 2014) (internal quotation marks omitted); *id.* ("For the same reason that prior 'bad acts' may not be used to show a predisposition to commit crimes, prior 'good acts' generally may not be used to show a predisposition not to commit crimes."). Before allowing prior good acts evidence for an admissible purpose, though, the Court must find that the evidence is probative when used for the purported non-character purpose. *Id.*

As with the hearsay challenge, on this limited record and without surrounding context, the Court cannot conclusively decide whether the evidence Stamper (or Akers) *may* seek to introduce is probative of a non-404(b)-barred purpose. Of course, Defendants could not introduce evidence

of interactions with patients unrelated to the charged conspiracy, or evidence of patient interactions outside of the alleged conspiracy timeframe, simply to suggest a general lack of criminality. *See Dimora*, 750 F.3d at 630–31 (precluding as irrelevant "evidence about acts with no connection to" the charged bribery conspiracy); *United States v. Qaoud*, 777 F.2d 1105, 1111 (6th Cir. 1985) (finding prior good acts evidence irrelevant where it "involved a totally different incident[]" and "demonstrate[d] little or nothing about [the defendant]'s intent on the charges made in this indictment"); *id.* ("Evidence of non-criminal conduct to negate inference of criminal condition is generally irrelevant.") (quoting *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978)). However, as the Government concedes, evidence of patient management and prescribing conduct—with respect to the patients underlying the Government's theory of the conspiracy, during the charged timeframe, and in the at-issue non-medical settings—could, potentially, be probative of Defendants' overall course of practice and prescribing intent.

Without precise knowledge of the potential evidence's nature (or its role related to the Government's broader trial theory), the Court cannot adequately assess whether such evidence is probative of a non-character purpose and definitively rule on admissibility. Insofar as the Government argues that Defendants "should generally be precluded from introducing prior good acts evidence unless [they] can articulate an admissible purpose for which the evidence is offered" under the Rules, though, the Court (given the tautological nature of the observation) agrees and grants the DE #42 ¶ 10 exclusion request to that extent. The Court will evaluate whether particular evidence in this category is probative of an admissible purpose in the full evidentiary context at trial.

### 3. The Government's Motion to Exclude Testimony

Lastly, the Government seeks to exclude the testimony of four defense witness groupings. DE #43; *see also* DE #43-1 (letter disclosing defense witnesses and vaguely summarizing anticipated testimony). Akers opposed exclusion, *see* DE #46, and the United States replied, *see* DE #48. The Court discusses each challenged witness set in turn.

**Drs. Reed and King**

Per Akers's disclosure, Drs. Reed and King will testify (in a non-expert capacity) regarding: (1) "the difficulty of Medicaid and or self insured patients getting referred to pain management and long lasting narcotic medicines as opposed to patients with private insurance"; (2) "their patient load as compared to Dr. Akers and . . . the number of referrals they have sent to Dr. Akers and the reasons for the referrals"; (3) recordkeeping requirements at Pikeville Medical Center; and (4) the doctors' purported later review of prescriptions Akers wrote to some patients. DE #43-1 at 1. The United States argues that each category of proposed testimony is improper and inadmissible.

The Government maintains that these matters have no bearing on whether Akers's prescribing conduct (during the indicted window and under the specific circumstances at issue) was within the scope of professional practice and for legitimate medical purpose. Akers's response does not individually address these challenges or explain the relevance of the anticipated Reed/King testimony. The Government's theory of the charged conspiracy is that Akers (with Stamper's assistance) issued narcotics prescriptions to certain patients from his home/other non-medical locations, without physical or in-person examinations, often in exchange for cash. Even given the low Rule 401 bar, it is difficult to see how the availability of doctors accepting Medicaid in the area would be relevant to these charges, the Government's case theory, or the anticipated

trial evidence.[12] Nor is it apparent, on this record, why the number of (or reason for) referrals to Akers would be relevant to whether he ultimately treated patients targeted in this Indictment per professional standards and for legitimate medical purposes. Further, the Court agrees that the recordkeeping practices at Pikeville Medical Center—a hospital setting, where Akers formally practiced emergency medicine—are not probative of Akers's recordkeeping for the class of patients at issue in this case (*i.e.*, those patients whom Akers prescribed narcotics in a non-medical setting). Finally, as to the fourth category of evidence, it is similarly unclear (at this point, at least) what the doctors intend to say about prescription review. Though Akers, perhaps, will be able to validly weave these topics into the broader evidentiary fabric at trial, their relevance is not facially apparent, at this stage.

Overall, given Akers's relatively vague description of the expected testimonial subject matter (and the lack of witness-specific clarification in his response brief), it is difficult to discern the precise substance of the proposed Reed/King evidence. Accordingly, to the extent that Reed and/or King ultimately seeks to testify along the Government-described lines regarding the first three noticed testimony categories, and provided that the Government's trial theory is just as it represents here, the Court anticipates excluding these matters as irrelevant. However, the Court declines to entirely preclude Drs. Reed and King from testifying on topics that are, in fact, relevant

---

[12] The United States argues that "even if there were no other doctors available to these patients in all of Kentucky, Dr. Akers would nonetheless be guilty of a crime if he prescribed Schedule II narcotics to them outside the scope of professional practice or without a legitimate medical purpose." DE #43 at 7–8. The Court generally agrees and rejects Akers's (confusing) accusation that this statement usurps the jury's factfinding role.

(and otherwise admissible), depending on the full scope of the Government's evidentiary presentation and developed case theory at trial.[13] This, too, must await trial concreteness.

### Dr. Arnold and Nurse Foley

Per Akers, Dr. Arnold and Nurse Foley plan to testify that Akers "would prescribe consistent with sound medical judgment and appropriate emergency room protocol as to controlled substance prescriptions[]" at the Paul B. Hall Medical Center. DE #43-1 at 1–2. At the outset, the Court agrees with the Government that Foley—a nurse, and thus herself unable to prescribe—has insufficient medical qualifications to opine regarding prescription legitimacy. Additionally, with respect to Akers's exercise of sound judgment in the emergency room context, a similar relevance analysis to the one discussed above would likely apply; if, as expected, the Government's case presentation and theory of the conspiracy solely comprise evidence of patient interactions and prescribing conduct in certain specific, non-medical settings during the relevant period, it is difficult to see the relevance of other medical professionals' general impressions of Akers's emergency room practice. Nevertheless, given the lack of specifics regarding the anticipated testimony, the Court defers a definite relevance determination; it will evaluate the potential relevance of any proposed Arnold/Foley testimony in the trial context, should Akers offer such.

That said, to the extent Arnold or Foley seeks to testify regarding Akers's prior prescribing conduct or general reputation as a doctor, they must do so within and obey the confines of Rules 404 and 405. Even if relevant, Rule 404 bars introduction of character evidence (whether in the form of general testimony, testimony regarding a specific trait, or testimony recounting prior conduct) to demonstrate that a person acted in accordance with that character on a specific

---

[13] The Court would, of course, require any ultimately introduced testimony to comply with the remainder of the evidentiary Rules, including establishment of Rule 602 foundational knowledge, as the Government notes. *See* DE #43 at 7.

occasion. *See* Fed. R. Evid. 404(a)(1) & (b)(1). An exception arises for a criminal defendant, however, when a character trait is pertinent to the offense charged. *See* Fed. R. Evid. 404(a)(2)(A) & 405. Akers could, thus—if he identifies a character issue pertinent to the case—offer opinion testimony regarding the pertinent character-related matter. *See* Fed. R. Evid. 405(a) ("When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion.").[14] However, Akers has not identified such a pertinent character trait, generally, much less one tethered to any specific witness's anticipated testimony; if Akers wishes to present general reputation testimony at trial, he bears the burden of demonstrating its pertinence and admissibility, per Rules 404(a)(2)(A) and 405(a).[15]

---

[14] Though Rule 405(b) permits testimony regarding specific incidents of prior conduct to establish character, the subsection applies only where character is explicitly tied to an element of a charged offense or a defense to the charge. *See, e.g.*, *United States v. Franco*, 484 F.3d 347, 352 (6th Cir. 2007) (noting that "Rule 404(a) character evidence is generally only admissible in the form of reputation or opinion," but "Rule 405(b) provides that '[i]n cases in which character or a trait of character of a person *is an essential element of a charge, claim, or defense*, proof may also be made of specific instances of that person's conduct.'") (quoting Fed. R. Evid. 405(b)) (emphasis added); *see also* Fed. R. Evid. 405, Advisory Committee Note (explaining that (b) permits character proof via specific conduct in a defendant's case in chief only "when character is actually in issue"); *United States v. Clark*, 377 F. App'x 451, 460 (6th Cir. 2010) (noting that, in evaluating whether character is an elemental issue, "[t]he relevant question should be: would proof, or failure of proof, of the character trait by itself actually satisfy an element of the charge, claim, or defense?") (quoting *United States v. Keiser*, 57 F.3d 847, 856 (9th Cir. 1995)). Based on the offenses charged and their elements, it does not appear that Akers's character is "actually in issue" here; nor does Akers identify any defense that elevates character to an elemental issue. Indeed, Akers does not argue that character is an essential element in this case (or even reference Rule 405(b) in his response brief), and, thus, Rule 405(b) is inapplicable.

[15] Further—as the Government notes—such character witness testimony on behalf of Akers, if admissible and ultimately introduced, would permit the United States to fully cross-examine Akers's witness, including inquiry into specific conduct allegations or incidents. *See* Fed. R. Evid. 404(a)(2)(A) (providing that "if the [character] evidence is admitted, the prosecutor may offer evidence to rebut it"); Fed. R. Evid. 405(a) ("On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct.").

It appears that Akers's primary admission theory for such evidence angles for Rule 404(b)'s limited-purpose allowance of prior acts proof. *See, e.g.*, DE #46 at 2 (maintaining that "the evidence at issue is not being used as evidence that [Akers] was of 'good[] character,' but to show a pattern of what Dr. Akers['s] medical practice was[]" per Rule 404(b)). Rule 404(b), as discussed, permits prior acts evidence for several non-character purposes, including "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident[,]" among other things. Fed. R. Evid. 404(b)(2).[16] Evidence of prior non-criminal acts used to demonstrate that the accused did not act criminally on an unrelated occasion, however, is generally inadmissible. *See United States v. Daulton*, 266 F. App'x 381, 386 (6th Cir. 2008) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant.") (quoting *United States v. Dobbs*, 506 F.2d 445, 447 (5th Cir. 1975).

Here, prior acts evidence could, in some contexts, serve purposes other than demonstration of Akers's character or propensity for legality. Evidence of Akers's interactions and prescribing conduct related to the at-issue patient class (*i.e.*, the group of patients that received prescriptions from Akers under the circumstances alleged in relation to the charged offenses), and within or germane to the indicted window, may be probative of his overall course of care of these patients and his prescribing intent with respect to them—non-character topics. That is, to the extent the Government's theory of the conspiracy rests on a common pattern of illicit prescribing (without meaningful patient exams, for medically unnecessary purposes, absent critical recordkeeping, etc.), Akers may present evidence regarding his care of the relevant patient class in order to present

---

[16] Here, as Akers seeks to introduce positive prior acts evidence, courts colloquially refer to the proof type as "reverse 404(b)" evidence. *See United States v. Lucas*, 357 F.3d 599, 605 (6th Cir. 2004). "Despite the different implications raised by the admission or exclusion of reverse 404(b) evidence," though, the Sixth Circuit "applie[s] [its] standard Rule 404(b) analysis in addressing the admissibility of such evidence." *Clark*, 377 F. App'x at 458.

a full picture of the care he provided to this class of patients.[17] Such proof could potentially be relevant to rebut the Government's theory that Akers conspired to prescribe (and, indeed, actually prescribed) to this patient class outside of professional medical parameters.[18] The Court thus declines to categorically exclude all reverse Rule 404(b) proof Akers may seek to admit via these witnesses, or others. Per this general analysis, and depending upon the Rule 404(b)-type evidence Akers actually seeks to introduce at trial, the Court will assess the evidence's purpose and determine admissibility on a particular basis. *See United States v. Lattner*, 385 F.3d 947, 955 (6th Cir. 2004) (requiring the district court to conduct an individualized, three-part Rule 404(b) inquiry, (1) preliminarily determining whether there is "sufficient evidence" that the other acts occurred; (2) whether the evidence is admissible for a proper Rule 404(b) purpose; and (3) whether any prejudice potential outweighs the evidence's probative value).

---

[17] This aligns with the Rule 404(b) admissibility analysis in *United States v. Al Asai*, upon which Akers relies. No. 3:16-cr-149-01-RGJ, 2018 WL 5816 769, at *1 (W.D. Ky. Nov. 6, 2018). *Al Asai* involved a SNAP benefit fraud scheme; the court declined to categorically exclude evidence of non-fraudulent transactions, but qualified that the such reverse 404(b) evidence would be permitted only to the extent it related to the Government's proof of a fraud scheme. *Id.* at *3 ("[T]he Court will permit such evidence to the extent directly relevant to the 'scheme' and/or the unsuccessful undercover buys."). Though Akers (like Al Asai) was not charged with "ceaseless criminal conduct," *see Daulton*, 266 F. App'x at 386, details of Akers's patient interactions with and practices regarding the at issue class (during the relevant timeframe) may be relevant to paint a holistic, complete picture of his care for these individuals. Thus, to the extent prior acts evidence becomes relevant to the alleged prescribing scheme alleged here (marked by commonalities in patient group, prescribing setting, etc.), and serves a proper Rule 404(b) purpose (such as intent), it may (not will, but may) be admissible.

[18] As discussed *supra*, however, the Court doubts the relevance (at least facially, at this stage) or admissibility of prior acts testimony regarding Akers's medical care outside of the charged conspiracy, *i.e.*, with respect to a different patient population or timeframe, or in a supervised medical facility, such as the Paul B. Hall Medical Center, where Arnold and Foley work. It is not clear, from Akers's disclosure, what factual knowledge Arnold or Foley might have regarding Akers's treatment specific to the patient class and circumstances underlying the Government's theory. Accordingly, though not categorically inadmissible, any Arnold/Foley testimony Akers ultimately seeks to introduce must relate to the charges here—not Akers's general history of medical practice. Moreover, as previously noted, Akers would have to establish that any testifying fact witnesses have sufficient personal knowledge of the testimonial substance, per Rule 602.

### Danny Hamilton

Akers anticipates that Hamilton, a physical therapist, will testify to Akers's patients' abilities to participate in physical therapy as a part of their treatment course, without obvious drug addiction issues, and to the appropriateness of Akers's treatment plans, generally. The Court agrees with the United States that, to the extent Hamilton's proposed testimony (as that of a non-physician) would offer a medical opinion of Akers's prescribing and treatment conduct, his qualifications are insufficient. Similarly, to the extent that Hamilton would testify (even factually) regarding signs and symptoms of drug abuse, his personal knowledge of such matters is unapparent on the current record.[19] Still, given the vague, general disclosure of Hamilton's proposed testimony's subject matter, the Court cannot conclude with certainty that it could have no relevance, in any form, provided that Hamilton does not speak to medical subjects on which he is unqualified to opine.[20] The Court will make a contextual decision as to particular admissibility of any Hamilton testimony during the course of trial.

### Jason Milkes

Per Akers, Jason Milkes worked for him for a time, and would testify to his experience doing so. Again, the Court notes that Milkes's qualifications (as provided) render him unable to opine on medical legitimacy of prescriptions or treatment. Beyond this observation, though, it is entirely unclear what Milkes's anticipated evidentiary role would be. The Court, thus—giving his proposed (ambiguous) testimony little attention, at this point, commensurate with the parties'

---

[19] The Court further notes that general testimony—regarding patient groups not at issue in this case, or with respect to a timeframe beyond the indicted period—would likely be irrelevant and thus inadmissible.

[20] As an example of potentially-admissible testimony from Hamilton, perhaps—if he treated the at-issue patients during the relevant period as a part of Akers's treatment plan—he could explain the role and importance of physical therapy as a part of the overall course of patient treatment and confirm that he, indeed, regularly saw any given patient(s) relevant in the case.

treatment—defers particularized admissibility ruling until trial, when the Court can concretely evaluate the substance of any Milkes testimony.

### Rule 16 Disclosures

The Court mentions, briefly, one final issue. The United States asserts, in multiple instances, that Akers's witnesses—if intended as experts per Evidence Rules 702 and 703 and Criminal Rule 16(b)(1)(C)—were not properly and timely disclosed to the Government. Akers does not address the disclosure issue in his response, nor does he characterize the identified witnesses as experts, for Rules purposes.[21] However, some of the proposed testimony (such as, for example, Arnold's—indeed, anyone's—assessment of Akers's "sound medical judgment" and appropriate treatment) facially appears expert in nature. As the issue is not squarely addressed in the briefing (given that the nature of the medical professionals' proposed testimony is not entirely clear), the Court does not here decide on any remedy for untimely expert disclosure, should such an issue arise, but notes that exclusion of untimely-disclosed expert proof may be a consequence, if and as appropriate. *See, e.g.*, *United States v. Hardy*, 586 F.3d 1040, 1044 (6th Cir. 2009) ("A proper sanction for failure to disclose, under Rule 16, is exclusion of the evidence.") (citing Fed. R. Crim. P. 16(d)(2)(C)).

4. **Conclusion**

For all of the stated reasons, the Court **ORDERS** as follows:

A. The Court, in large part, **DENIES** DE #34, to the extent the Court finds the Agreed Order (and the investigation, at least contextually) admissible and declines to

---

[21] Indeed, Akers notes in his disclosure letter that, while some of the anticipated testimonial subjects may appear expert in nature, he believes that the identified witnesses' testimony would mostly be factual. *See* DE #43-1.

categorically exclude evidence relating to prescription drug abuse, on the terms here outlined;

B. The Court **GRANTS in part** DE #42, to the extent outlined here, but otherwise defers specific admissibility rulings until trial; and

C. The Court **GRANTS in part** and **DENIES in part** DE #43, on the terms discussed in this Opinion, and will rule specifically as to admissibility of the evidence from the identified witnesses in context at trial, depending upon testimonial substance.

This the 7th day of October, 2019.

Signed By:
*Robert E. Wier*  REW
United States District Judge