UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 7:19-CR-7-REW-EBA |
| v. | ) | |
| | ) | OPINION AND ORDER |
| SCOTTY R. AKERS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The Court confronts the Government's pending pretrial motions: (1) a request for use of a jury questionnaire (DE #105) and (2) a motion *in limine* seeking to exclude various categories of evidence during the retrial. (DE #104). The matters are briefed.

**1. Motion for Jury Questionnaire**

The United States advocates for use of a brief juror questionnaire preceding voir dire. DE #105; DE #105-1 (Proposed Questionnaire). The Government argues that such a questionnaire would aid in selection of an impartial jury by reducing risk that jurors may misunderstand or neglect to fully respond to particular questions. Defendants Dr. Scotty Akers (Akers) and Serissa Akers (Serissa) oppose use of the questionnaire, generally, as unnecessary. DE ##124, 126.[1]

The Court has broad discretion to conduct voir dire and manage the mechanics, as appropriate, per Rule 24 and applicable case law. *See, e.g.*, *United States v. Schmucker*, 815 F.2d

---

[1] Serissa expresses additional concern that use of a pre-jury-selection questionnaire could have the unintended effect of improperly encouraging outside juror research. The Court is confident that a properly crafted admonition included in the questionnaire (as the Government proposes and other courts have employed) could sufficiently guard against such risk, as it does in voir dire. Regardless, use of a questionnaire here is not needed.

1

413, 421 (6th Cir. 1987) (noting that Rule 24 "gives the court very broad discretion on the conduct of the voir dire examination of prospective jurors[]") (quoting 2 C. Wright, *Federal Practice and Procedure* § 381, at 332 (1982)); *United States v. Phibbs*, 999 F.2d 1053, 1071 (6th Cir. 1993) (observing that trial courts have "broad discretion" and "great latitude" in handling voir dire) (citations omitted). Critically, "[a]n individualized examination of the jury venire is not [ ] required by the United States Constitution." *Phibbs*, 999 F.2d at 1071. The Court's broad discretion extends to juror questionnaire use. *See, e.g.*, *id.* at 1071–72 (finding no abuse of discretion where trial court rejected a juror questionnaire "not needed to compose a fair-minded jury"); *United States v. Treacy*, 639 F.3d 32, 46 (2d Cir. 2011) ("Although we have approved the use of questionnaires as one of many tools available for voir dire, we have expressly declined to hold that district judges are ever obligated to make use of this procedure in selecting juries.") (internal quotation marks and citation omitted); *United States v. Eakes*, No. 5:18-CR-00023-TBR, 2019 WL 1320513, at *1 (W.D. Ky. Mar. 22, 2019); *United States v. Trumbo*, No. 18-20403, 2019 WL 652303, at *4 (E.D. Mich. Feb. 15, 2019); *Vanderbilt Mortg. & Fin., Inc. v. Flores*, No. 09-CV-312, 2010 WL 4281932, at *1 (S.D. Tex. Oct. 25, 2010) ("[I]t is in the Court's discretion to decline submission of a juror questionnaire that the Court finds unduly invasive or simply unnecessary.").[2]

Though the United States's proposed questionnaire covers proper topics, all are easily addressed during voir dire. The Court covered substantially all of them with the venire in the first trial of this case and will do so again in the retrial. And, counsel is always free to supplement the Court's questioning with appropriate inquiries. Further, the Court will permit (and encourage)

---

[2] In a similar case—involving physicians' alleged unlawful distribution of prescription opiates—this Court recently rejected a juror questionnaire request, finding that it would not substantially advance the voir dire process. *See United States v. Gowder*, No. 6:17-CR-25-REW-HAI, 2019 WL 109350, at *1 (E.D. Ky. Jan. 2, 2019).

2

potential jurors to approach the bench with any matter they feel is sensitive or private, or may influence the remaining venire, as in the previous trial; the Court doubts, in its experience, that such a measure deters disclosure in any way. Voir dire necessarily probes for personal information, in any trial, and bench conferences consistently afford jurors the privacy needed to fulfill their oath-bound duties to completely and truthfully respond to the Court's and parties' questions. There is no reason to depart from the general practice in this case.[3] Additionally, the Court is not persuaded that pretrial questioning of jurors in written form will reduce potential for juror oversight or misunderstanding; on the contrary, courtroom questioning during voir dire is more direct and accessible, fostering a more organic conversation among the Court, counsel, and venire. Indeed, the Court is available during voir dire for query explanation and clarification, and it can personally gauge—and remedy—any juror misinterpretation or confusion. Relatedly, one prospective juror's question or response may benefit the entire pool's understanding of a topic. On balance, the Court finds traditional courtroom voir dire the better approach, absent unusual circumstances inapplicable here, and declines to needlessly duplicate its questioning efforts with a preliminary questionnaire.[4]

---

[3] Both criminal and civil trials regularly involve issues relating to controlled substance use and misuse. Medication and addiction are often inherently personal topics for jurors, but no more so under the facts of this case than in any other like trial. The mere involvement of discussion concerning drug use—even as it relates to healthcare providers and patients—does not, in the Court's view, call for materially altering the traditional voir dire model or requiring questionnaires.
[4] The Court also observes that the proposed questionnaire does not—and, realistically, could not—address the most pressing juror screening issue that the Government raises: prospective jurors' recognition or knowledge of potential witnesses or other individuals mentioned throughout the case. As the United States notes, two seated jurors came forward during the first trial to alert the Court to their recognition of witnesses, as they had been unable to identify the potential connections during voir dire due to the individuals' common names. As the trial record reflects, the Court questioned the jurors individually and thoroughly on the topic; both confirmed that the respective connections were comfortably distant and would in no way impact their impartiality or fairness as jurors. The Court emphasizes, in pursuit of adequacy, the benefit of more detailed

For these reasons, use of a juror questionnaire (beyond the generic juror qualification forms used in this District) would not substantially further the voir dire goals or aid in the process, and the step ultimately would be more burdensome on the venire than beneficial to the result. Accordingly, in its discretion, and accounting for the details of this case and the first trial, the Court finds use of a written pretrial questionnaire unnecessary and **DENIES** the DE #105 request.

2. **Motions** *in Limine*

The Government seeks to exclude reference to four separate categories of evidence: (1) Akers's volunteer work with the Sheriff's Department and/or association with law enforcement officers; (2) Akers's volunteer work with the Pikeville High School football team; (3) Akers's treatment of patients (particularly, Cassie Gearles), during the at-issue 21-month period after his formal practice closed, that did not involve opioid prescribing; and (4) other prior good acts unrelated to Akers's medical practice. DE #104. Defendants oppose exclusion of all but the final group. DE #125, 127. The Court addresses each evidentiary category in turn.[5] The Court is sensitive to the fact that proof, in cases of this nature, often includes circumstance and inference.

*Sheriff's Department / Law Enforcement Connection*

The Government objects to use of this evidence in two particular ways, on both relevance and Rule 404 grounds. First, the United States argues that, at the first trial, Akers used his prior

---

witness identification (perhaps featuring additional descriptors like locale, age, etc.) during the retrial's voir dire process, but the proposed questionnaire would not aid in the endeavor.

[5] Before the first trial of this matter, the Court ruled on several liminal matters. DE #50. As noted, those rulings are equally applicable to the retrial. *See* DE #88. Aspects of the instant motion somewhat overlap with the previous efforts, and the Court avoids rehashing its prior analysis to the extent possible. Further, though the Government's motion relates primarily to Akers, the proof it seeks to exclude indirectly impacts Serissa's defense. Serissa's liability is, to a degree, derivative of Akers's, in that her guilt or innocence depends in part on Akers's prescribing legitimacy and her understanding and perception of their joint endeavor. Accordingly, though the Court primarily analyzes the evidentiary categories in relation to Akers's defense presentation (as is the DE #104 motion's focus), it is also mindful of the challenged proof's potential role in Serissa's case.

4

volunteer work with the Sheriff's Department and association with law enforcement officers to suggest that he is a good, charitable person who has assisted the community and law enforcement in the past and, thus, would not engage in illegal conduct. As the Government contends, such an argument constitutes impermissible character evidence use. *See* Fed. R. Evid. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."). Akers may not use his past community volunteer efforts, or the fact of mere association with law enforcement, to argue that he is a generous and law-abiding community member that would not have committed the alleged offenses.[6]

---

[6] Though character evidence, in the form of specific conduct instances, may be admissible where essential to a particular offense or defense element, Akers has not identified (nor did he identify in the first trial) any such pertinent character trait, and the Court perceives none. *See* DE #50 at 15 n.14 (collecting relevant cases and observing that character is not an essential element of any charge in this case); *see* Fed. R. Evid. 404(a)(2) (stating that, in a criminal case, "a defendant may offer evidence of the defendant's pertinent trait"); Fed. R. Evid. 405(b) ("When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct."). Additionally, though Defendants may present opinion or reputation evidence concerning general law-abidingness, the Government correctly notes that the evidence Rules accord it considerable latitude to explore that topic (including inquiry into specific instances of conduct) on cross. Fed. R. Evid. 405(a) ("When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct."); *see United States v. Green*, 305 F.3d 422, 431 (6th Cir. 2002) (noting that witnesses may opine as to a defendant's lawful character, or testify as to his reputation for lawfulness, but, if they do, the Government may cross-examine the witnesses concerning their awareness of specific events); *United States v. Al Asai*, No. 3:16-CR-00149-01-RGJ, 2018 WL 5816769, at *4 (W.D. Ky. Nov. 6, 2018) (collecting cases) ("As to evidence of character of law-abidingness, Courts have held that the general character trait of law-abidingness is pertinent to almost all criminal offenses."); *United States v. McGuire*, 744 F.2d 1197, 1204 (6th Cir. 1984) ("Once a defendant's reputation is in issue, the prosecution has wide latitude on cross-examination."); *see also Michelson v. United States*, 69 S. Ct. 213, 220 (1948) ("The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him.").

Relatedly, such an argument would veer into improper "reverse 404(b)" evidentiary territory. *See* Fed. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); *United States v. Lucas*, 357 F.3d 599, 605 (6th Cir. 2004) (discussing the "subset of [Rule 404(b)] evidence sometimes called 'reverse 404(b)' evidence, in which the evidence of a prior act by another is offered as exculpatory evidence by the defendant, instead of being used by a prosecutor against a defendant[]"); *United States v. Clark*, 377 F. App'x 451, 458 (6th Cir. 2010) ("Despite the different implications raised by the admission or exclusion of reverse 404(b) evidence, we have applied our standard Rule 404(b) analysis in addressing the admissibility of such evidence."). Akers may not use evidence of his volunteer work with the Sheriff's Department or other previous good works in the community to demonstrate his good character and suggest that he would have acted in accordance with it during the conspiracy timeframe. Moreover, use of the law-enforcement-related proof in this way would likely not clear the Rule 401 relevance hurdle; as the United States notes, Akers's prior volunteer role with the Sheriff's Department and social relationships with police officers are of doubtful probative value in the instant case. *See* Fed. R. Evid. 401 (providing that relevant evidence tends to make any fact of consequence in determining the case more or less probable than it would otherwise be).

Second, the Government objects to any suggestion that Akers's conduct could not have been illegal because his law enforcement friends (and patients, in some instances) knew of it and did not intervene. The United States argues that such a theory is speculative and irrelevant. The Court partly agrees. Akers's law enforcement acquaintances may not in any way opine on the ultimate legality of Akers's conduct. However, if Akers treated police officers (including with opioid prescriptions) during the office-closure period, he may offer proof of such treatment and

6

may identify them as officers. A law enforcement officer as patient in this context reflects positively on Akers's criminal intent and good faith in the manner of practicing and prescribing. The Court may apply limits to the proof and resulting argument, but the Court will not bar Akers from identifying law enforcement he treated during the closure window.

Aside from the improper uses described, the Court declines to find that there is *no* potentially permissible role for the challenged law enforcement evidence. Reverse 404(b) evidence, if relevant, may be admissible for a non-character purpose, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The Court thus declines to bar the proof wholesale. Defendants may not use this evidence to make the impermissible arguments discussed, but they are free to articulate a relevant, admissible use for the evidence (including potential witness testimony) if applicable at trial. Of course, any introduction of such proof is subject to the Court's evaluation and ruling in the concrete trial context.[7]

---

[7] The Court readily confirms its intent to exclude evidence if offered for the particular impermissible reasons contemplated but, as noted in DE #50, is reluctant to find that there could be no conceivable legitimate purpose and categorically bar entire classes of proof without factual context. *See* DE #50 at 1 n.1; *Bouchard v. Am. Home Products Corp.*, 213 F. Supp. 2d 802, 810 (N.D. Ohio 2002) ("The court has the power to exclude evidence in limine only when evidence is clearly inadmissible *on all potential grounds*.") (citing *Luce v. United States*, 105 S. Ct. 460, 463 (1984)) (emphasis added); *Gresh v. Waste Servs. of Am., Inc.*, 738 F. Supp. 2d 702, 706 (E.D. Ky. 2010) (generally remarking that "rulings [on evidentiary matters] should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context"); *United Propane Gas, Inc. v. Pincelli & Assocs., Inc.*, No. 5:13-CV-190-TBR, 2018 WL 6533341, at *1 (W.D. Ky. Dec. 12, 2018) ("Motions in limine provided in advance of trial are appropriate if they eliminate evidence that has *no legitimate use at trial for any purpose*.") (emphasis added). The Court will, as it did in the first trial, endeavor to thoughtfully and fairly apply the evidentiary Rules throughout the trial, preserving Defendants' right to present a complete defense using admissible evidence.

*High School Football Evidence*

The United States argues that the testimony of Pikeville High School football coach Chris McNamee was irrelevant under Rule 401 and, even if marginally relevant, substantially more prejudicial than probative per Rule 403. At the first trial, McNamee testified that Akers volunteered as the team physician for several years,[8] utilizing a mobile medical trailer equipped with athletic training supplies. Though Akers may not simply align himself with a popular local figure to gain favor with the jurors, as the Government fears, the Court perceives potential admissible uses for the medical trailer evidence. For example, the first trial demonstrated a common argument thread, throughout the prosecution's case theory, regarding non-medical-setting treatment illegitimacy. Defendants may fairly address the notion that non-clinic treatment is a red flag, indicative of medical practice outside the professional scope, by presenting a full picture of Akers's practice outside of formal medical settings.[9] Similarly, to the extent Akers's medical work with the football team extended into the alleged conspiracy period,[10] it could potentially be relevant to complete the picture of Akers's overall scope and manner of medical practice during the relevant timeframe.

The Court does not exhaustively list all conceivable ways that Akers's medical work with the team (including use of the on-site medical trailer) could be relevant, but simply concludes that wholesale exclusion of all team-related proof is unwarranted at this stage. The McNamee proof was but a sliver of the case. If Defendants can link proof in this category to facts or theories

---

[8] McNamee could not recall a precise date range or timeframe for Akers's involvement with the team.
[9] The Court also notes that use of the medical trailer may not relate solely to Akers's treatment of high school football players. For example, at the first trial, Officer Collins (an adult patient of Akers) testified to receiving carpal tunnel injections at the Pikeville High School football field near (but not explicitly in) Akers's mobile medical trailer.
[10] It is not clear, from the first trial record, whether this is the case.

presented at the retrial, in a manner that clears the (low) Rule 401 relevance bar, they may seek to introduce it at that time and the Court will rule on admissibility in context.[11]

*Treatment of Cassie Gearles and Similar Patients*

At the first trial, Akers presented testimony from Cassie Gearles, whom he had diagnosed with a rare condition as a child and continued to treat throughout her adulthood, including during the alleged conspiracy period. The testimony demonstrated that Akers treated Gearles[12] from his home during the relevant timeframe, but he did not prescribe opioids for her during that period. The Government's case theory centers on a specific group of patients—many explicitly referenced in the Indictment and/or Superseding Indictment—that received opioid prescriptions from Akers in non-medical settings between August 2016 and May 2018. The United States thus contends that patients for whom Akers did not prescribe opioids during that period are irrelevant to the case.

However, though the Government's theory is relatively narrow, the entire factual case scope is not so limited. Akers's treatment of Gearles occurred during the alleged conspiracy window (the period after Akers's clinic closed) and occurred outside of a formal medical setting. Akers's treatment of Gearles and similarly-situated patients thus overlaps with the charges in multiple ways and appropriately contributes to the broader picture of Akers's non-clinic medical practice and treatment activities—the scope of his claimed professional practice—during the relevant period. *See, e.g.*, *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) (noting that proper background evidence "consists of those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged

---

[11] Of course, if Defendants can clear the relevance hurdle, the Court will balance the evidence's probative value and prejudicial impact under Rule 403 as appropriate (and apply any other pertinent Rules implicated).

[12] The Court also heard testimony from Cassie's father, Ron Gearles. The United States does not specifically discuss his testimony, and the Court's references to "Gearles" here pertain to Cassie.

9

offense"); *id.* ("Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense.").

That Akers did not prescribe Gearles opioids during the alleged conspiracy period does not remove evidence concerning her treatment from the applicable *res gestae* realm. On the contrary, evidence concerning Akers's in-home examination and treatment of patients between August 2016 and May 2018 that did not involve opioid prescribing is relevant to Defendants' theory that Akers appropriately, and consistently over time, employed a range of techniques, including but not exclusively limited to opioid prescribing, to address his patients' legitimate medical needs in accordance with his professional judgment. Further, evidence regarding patients (like Gearles) with long-term illnesses—and with whom Akers had great familiarity and a lengthy relationship—bears on the legitimacy of Akers's perception of and medical response to permanent and/or relatively static conditions. In sum, to restrict the evidence to only those patients strictly needed to prove the Government's case—patients that allegedly received multiple opioid prescriptions in parking lots during the particular 21-month period—would perhaps artificially and unfairly limit the jury's understanding of Akers's overall treatment habits and prescribing intent during the relevant timeframe. Insofar as patients (such as Gearles) received treatment from Akers in a non-medical setting during the charged conspiracy window, they are likely relevant to complete the story of the charged offenses, from the defense perspective.[13] Defendant may generally describe

---

[13] To the extent Defendants would seek to use Gearles's "life-saving" childhood diagnosis as impermissible prior good acts evidence—*i.e.*, to show that Akers was a good doctor in the past and, therefore, would not have improperly prescribed opioids during the at-issue period—or merely to garner jury sympathy, the Court would exclude it. However, Akers's treatment of Gearles and similarly-situated patients is probative of his medical practice and prescribing conduct

Gearles as a long-time patient and may cite her diagnosis. The defense shall not present the dramatic tale of Akers's lifesaving diagnosis from 2003.

*Other Prior Good Acts Evidence*

The Court briefly addresses the last category of evidence mentioned. The Government, as a general matter, renews its oft-raised (and sustained) prior objections to Akers's attempted use of improper reverse 404(b) evidence during the first trial. The Court will apply the applicable Rules (including Rule 404) at the retrial and expects the parties to adhere to same. Defendants may not, of course, (and nor may the Government) introduce prior acts or character evidence except as expressly permitted by Rule 404. The Court expects and will enforce compliance with the Rules.

3. **Conclusion**

For the reasons discussed, the Court **DENIES** DE #105 and **GRANTS in part** and **DENIES in part** DE #104, per the terms outlined in this Opinion.

This the 5th day of March, 2020.

Signed By:
*Robert E. Wier* REW
United States District Judge

---

during the relevant period, and Gearles's specific diagnosis (and her age when it occurred) is relevant to demonstrate Akers's overall course of care for her and the length of their medical relationship. The Court will, of course, monitor any proof of this sort that is ultimately introduced at trial to ensure that its use remains on the admissible side of the line.